IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SHALIMAR TROTTER, | ) | CASE NO. 1:16CV1362 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Shalimar Trotter ("Trotter") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

As set forth more fully below, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

## I. Procedural History

Trotter previously received SSI as a child. Tr. 59. Upon reaching the age 18, the Social Security Administration reviewed her eligibility for benefits and, on March 12, 2013, determined that she was no longer disabled. Tr. 102-105. Trotter requested reconsideration (Tr. 110) and a Disability Hearing Officer held a hearing on May 15, 2014. Tr. 111-122. The Disability Hearing Officer affirmed the Administration's conclusion on July 8, 2014. Tr. 124-132. Trotter requested an administrative hearing (Tr. 141) and a hearing was held before Administrative Law

1

Judge Peter Beekman ("ALJ") on March 16, 2015. Tr. 79-95. In his May 27, 2015, decision (Tr. 59-70), the ALJ determined that there are jobs that exist in significant numbers in the national economy that Trotter can perform, i.e., she is not disabled. Tr. 68. Trotter requested review of the ALJ's decision by the Appeals Council (Tr. 55) and, on April 7, 2016, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-4.

## II. Evidence

### A. Personal and Vocational Evidence

Trotter was born in 1994 and was 18 years old when her childhood disability benefits were discontinued. Tr. 68, 102. She graduated from high school and, at the time of the hearing, was in her second year of college. Tr. 82. She has no work experience. Tr. 43.

### B. Relevant Medical Evidence

Trotter was born with Treacher-Collins Syndrome, a craniofacial disorder causing external ear anomalies and middle ear malformations. She was born without ear canals on either side of her head and small skin tags where the external anatomy of her ears did not develop. Tr. 476. When she was seven years old, she had bone-anchored implants ("BAHA") surgically placed in her head. Tr. 476. Gold bars were attached to her implants so that prosthetic ears could be attached with clips. Tr. 476. The clips required periodic adjustments and the prosthetics break down over time and new ones need to be made every couple of years. Tr. 476. She also has a jaw deformity, and, on December 22, 2011, underwent mandibular/maxillary surgery to correct her jaw deformity and occlusion. Tr. 439.

On September 9, 2011, Trotter's treating otolaryngologist, James E. Arnold, M.D., performed bilateral auricular remnant resection surgery because Trotter's cartilage and skin were growing over her BAHAs on both sides. Tr. 263-264.

On May 9, 2012, audiologist Leslie Schulman, Au.D., examined Trotter. Tr. 560. Dr. Schulman commented that Trotter used to wear her BAHAs on both sides but was not wearing the one on the right side due to "sensitivity issues." Tr. 560. She stated, "[Trotter] is doing well with her BAHA." Tr. 560. Trotter's word recognition ability was excellent bilaterally (100%) and aided warble-tone testing revealed thresholds ranging from 15 to 25 for 500-4000 Hz, which represented "a significantly and satisfactory benefit from the BAHA Divino on her left ear." Tr. 560.

On December 10, 2012, Trotter saw Dr. Arnold for a follow-up visit. Tr. 278. Dr. Arnold wrote, "unfortunately, she once again has skin overgrowth of her right abutment and she is not able to wear her hearing aid." Tr. 278. Dr. Arnold commented that Trotter's skin overgrowth intermittently responds to steroid cream but always grows back. Tr. 278. He planned another outpatient revision surgery to correct the skin overgrowth of her right abutment, "probably" to occur in January 2013. Tr. 278.

**C. School Records**

Trotter had an Individualized Education Plan (IEP) in school. A report dated November 24, 2008, commented that Trotter "successfully communicates with teacher and peers" and "works well with others and has developed positive relationships with peers." Tr. 430.

Trotter's IEP records note that, when she was in eleventh grade, she was taking honors courses and her intellectual functioning was measured to be within the average range. Tr. 535. Her hearing loss was described as "educationally handicapping and adversely affects educational

3

performance, and can result in increasing difficulty in group discussions as well as deficiencies in speech language usage, vocabulary and comprehension." Tr. 536.

On February 22, 2012, Melonee Adalikwu completed an IEP report, stating that background noise in the learning environment may likely interfere with Trotter's hearing. Tr. 534. She recommended that Trotter get involved in group activities, including within the deaf/hard of hearing community, which "may help [her] secure a healthy attitude about her own disability." Tr. 534. On December 17, 2012, Trotter became the leader of the sign language club at her school. Tr. 524.

An IEP report in early 2013 noted that Trotter was looking forward to graduating high school that year and going to college in the fall, perhaps getting a nursing degree and working as a nurse in the neonatal intensive care unit or becoming an interpreter. Tr. 518. With classroom accommodations including extended time, "allowed corrections," and preferred seating, she had a GPA of 4.0. Tr. 518-519. At that time, Trotter only had one working BAHA, her right, and she was wearing her right BAHA on her left ear as she was "awaiting replacement." Tr. 519. Her extracurricular activities included the sign language club and volunteering at the mayor's office. Tr. 518.

**D. New Evidence**

<u>Submitted to the Appeals Council</u>: On June 24, 2015, a month after the ALJ's decision, Trotter underwent a Craniofacial Clinic Team Evaluation at Rainbow Babies & Children's Hospital. Tr. 6-8. The plastic surgeon evaluator noted Trotter's past plastic surgery in December 2011 and that the outcome of that surgery was "excellent." Tr. 6. The day of her evaluation she reported doing well. Tr. 6. She complained that her right jaw kept locking up and she had to press on it to get it to close and that this was painful. Tr. 6. The orthodontic

evaluation team noted some occlusion abnormalities, commented that Trotter preferred to fix the issues, and recommended she set up an appointment with the craniofacial orthodontic clinic. Tr. 7.

With respect to Trotter's hearing, she reported that her right BAHA was not working and that she had not been hearing as well as she used to. Tr. 7. The evaluating audiologist Allyson Valentine, Au.D., cleaned Trotter's right BAHA and commented that there was a lot of battery corrosion. Tr. 7. She wrote, "This was cleaned, the BAHA is now in good working condition and sounds excellent." Tr. 7. Dr. Valentine commented that BAHA are programmed to work together and, if Trotter was only wearing one, it may explain why Trotter was noticing a change in her hearing. Tr. 7. Dr. Valentine also remarked some skin overgrowth on Trotter's right abutment site and recommended a follow-up with Dr. Arnold. Tr. 7. The ear, nose and throat evaluator, Todd Otteson, M.D., stated that Trotter's right abutment site was improved since her last visit with Dr. Arnold, but that she still had a slight amount of skin overgrowth posteriorly. Tr. 8. Trotter "is planning to see Dr. Arnold within the next month or so," and Dr. Otteson deferred a formal audiogram until that time. Tr. 8.

Obtained after the Appeals Council:

On January 8, 2016, Trotter presented to Dr. Arnold with ongoing issues with her BAHA site on the right side related to hypertrophic scarring with difficulty placing the processor. Tr. 12. She also recently noticed a blister near her left BAHA site. Tr. 12. Dr. Arnold incised and drained the soft tissue abscess at her left BAHA site, performed hypertrophic scar revision of her right BAHA site, and replaced the right BAHA abutment. Tr. 11.

E. Medical Opinion Evidence

1. Treating Physician

On December 17, 2014, Dr. Arnold wrote a letter stating that he was currently treating Trotter for skin overgrowth to the right abutment, which kept her from using her BAHA and that compromised her communication abilities. Tr. 577. He wrote that this issue was likely to be an intermittent, long-term, ongoing problem. Tr. 577.

### 2. State Agency Reviewers

On January 28, 2013, state agency reviewing physician Linda Hall, M.D., reviewed Trotter's record. Tr. 433-439. Regarding Trotter's residual functional capacity ("RFC"), Dr. Hall found communicative (hearing) and environmental limitations stemming from Trotter's hearing limitations. Tr. 436. She noted that Trotter would need "prolonged" follow up for her ears. Tr. 434.

On May 28, 2013, state agency reviewing physician Eli Perencevich, D.O., reviewed Trotter's file. Tr. 485-491. Dr. Perenchevich opined that Trotter should not climb ladders, ropes, or scaffolds and that she had some hearing, speaking, and environmental limitations. Tr. 486, 488. He also noted that there were no comments about speech in Trotter's medical file. Tr. 488.

### E. Testimonial Evidence

#### 1. Trotter's Testimony

Trotter was not represented by counsel at the administrative hearing. Tr. 81-95. At the time of the hearing she was 20 years old and a sophomore in college. Tr. 81-82. She testified that she lives by herself in an apartment. Tr. 85, 87. She has no special problems living by herself, other than she has not done it before. Tr. 87. Sometimes, when she has problems with her "head," she has to get it done herself without help. Tr. 87.

Trotter testified that she has BAHAs for both sides of her head. Tr. 82. She can't hear with them as well as she used to because now they are run through a computer and she has to keep going back to have the sound adjusted. Tr. 82-83. Without her BAHA she cannot hear at all, and with them she cannot hear behind her. Tr. 83. She also explained that she has very stretchy skin, and that she can't wear her right BAHA because her skin keeps growing over and interfering. Tr. 83. She hasn't worn her right BAHA for seven years. Tr. 83. Also, when it is very loud, for instance during a fire alarm, her BAHA turns off. Tr. 83, 85. When the loud noise stops it will turn itself back on. Tr. 83, 85. Her BAHA also does not pick up everything a person is saying, so she has to turn her head a little bit to understand what people are saying. Tr. 83. She can hear without reading lips but she also reads lips and listens. Tr. 84. Over the past few months, it has gotten worse with her new BAHA—she liked her old ones better but they have been discontinued. Tr. 83. When she talks on the phone she puts her phone on speaker and holds the phone within an inch of her head on the left side. Tr. 84.

Trotter also testified that her Treacher-Collins Syndrome causes her to slur her speech if she talks for too long. Tr. 85. She also drools sometimes when she is talking but is unable to know that she is doing this. Tr. 85.

Currently, in college, her grades are "okay"; she is getting Bs and Cs, although she used to get straight As. Tr. 85. She believes her grades have dropped because it is hard since she got her new BAHA. Tr. 86. She sits in front in class and has an interpreter. Tr. 86. Regarding her interpreter, she stated, "I feel like I wanted to take a semester off from using the interpreter because I feel like [I] was relying on her too much. But that clearly didn't work." Tr. 86. She is studying to be an interpreter for sign language. Tr. 87.

Trotter is bothered by extreme cold; it causes the screws in her jaw to lock up. Tr. 86. She is not bothered by soft vibrations, but if her phone was set on vibrate, her hearing aid would make a beeping noise for a very long time even after the phone stopped vibrating, and during that time she can hear no other noises. Tr. 86. She can't reset it herself; she has to wait for it "to do whatever it do[es] by itself." Tr. 87. The longest it has taken to reset itself was fifteen minutes. Tr. 87.

Trotter also has prosthetic ears, which she hates because "You can tell they don't look real." Tr. 87. High heat bothers them; they are made out of wax and will change color or sometimes get smaller. Tr. 88.

### 2. Vocational Expert's Testimony

Vocational Expert Thomas Nimberger ("VE") testified at the hearing. Tr. 90-93. The ALJ asked the VE to determine whether a hypothetical individual of Trotter's age and educational background could perform any jobs in the regional or national economy if that person had the following characteristics: has limited hearing in that she is required to wear at least one hearing aid and has no limitations in speaking. She should avoid high concentrations of heat, cold, noise and vibrations, dangerous machinery, and would have difficulty ascertaining audiologically any danger she may be in. She can only have superficial interpersonal interactions with coworkers and supervisors and no contact, i.e., interaction, with the general public. She cannot do telephone work because of the screws in her jaw and should have to talk only occasionally. Tr. 90-91. The VE testified that such a person could perform work as a mailing house worker (48,000 national jobs, 400 northeast Ohio jobs), polisher (39,000 national jobs, 410 northeast Ohio jobs), and mail clerk in a sorting room (83,000 national jobs, 490 northeast Ohio jobs). Tr. 92.

The ALJ asked Trotter if she had any questions for the VE. Tr. 93. Trotter asked, "If I was to be able to work, I have surgery a lot. So how would I even be able to keep a job?" Tr. 93. The ALJ asked Trotter how often she has surgery, and Trotter replied that she has surgery 4-5 months apart. Tr. 93. She "just had surgery in July and then turned around and had surgery again in January and then turned around and had it again in February." Tr. 93. She missed a month of school. Tr. 93. She also has jaw surgery every 4 years. Tr. 93. Her last one was in 2012 and she missed school "from December all the [w]ay to the end of February. But my mouth was wired shut and that was all the way until April." Tr. 93-94. The ALJ then asked the VE what his answer would be if the hypothetical individual would miss three or more days per month. Tr. 94. The VE testified that such a person could not maintain employment. Tr. 94.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

9

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[1] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In his May 27, 2015, decision, the ALJ made the following findings:

1. The claimant attained age 18 on October 19, 2012 and was eligible for supplemental security income benefits as a child for the month preceeding the month in which she attained age 18. The claimant was notified that she was found no longer disabled as of March 1, 2013, based on a redetermination of disability under the rules for adults who file new applications. Tr. 61.

---

[1] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

2. Since March 1, 2013, the claimant has had the following severe impairments: Treacher-Collins syndrome with hearing loss; a depressive disorder (NOS) and a learning disorder. Tr. 61.

3. Since March 1, 2013, the claimant did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 62.

4. Since March 1, 2013, the claimant has had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant has no limitations speaking, but she requires an environment that allows her to wear a least one hearing aid. The claimant shall not be required to perform telephone work and she should have only an occasional requirement to talk. She should avoid high concentrations of heat, cold, noise, vibration and avoid all exposure to dangerous machinery. Finally, the claimant is limited to only superficial interactions with coworkers and supervisors and no contact with the public. Tr. 63.

5. The claimant has no past relevant work. Tr. 68.

6. The claimant was born on October 20, 1994 and is a younger individual age 18-49. Tr. 68.

7. The claimant has at least a high school education and is able to communicate in English. Tr. 68.

8. Transferability of job skills is not an issue because the claimant does not have past relevant work. Tr. 68.

9. Since March 1, 2013, considering the claimant's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. Tr. 68.

10. The claimant's disability ended on March 1, 2013 and the claimant has not become disabled again since that date. Tr. 70.

## V. Parties' Arguments

Trotter objects to the ALJ's decision on one ground: this case should be remanded for the consideration of new and material evidence and for the ALJ to consult with a medical expert to

consider listing equivalence based on this evidence. Doc. 14, pp. 6-10. In response, the Commissioner submits that the evidence submitted by Trotter dated after the ALJ's decision is not material, Trotter fails to show good cause for not including this evidence in the administrative proceedings, consultation of a medical expert is not warranted, and that Trotter does not show she meets or equals a listing. Doc. 17, pp. 5-10.

## VI. Law & Analysis

When an ALJ renders the final decision of the Commissioner, additional evidence submitted before or after the Appeals Council denies review should be considered only for the purpose of a Sentence Six remand. *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). A court may order a Sentence Six remand upon a showing by the moving party that (1) the additional evidence is both "new" and "material" and (2) there is "good cause" for failing to provide the evidence previously. 42 U.S.C. § 405(g); *Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 483 (6th Cir. 2006) (quoting *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 174 (6th Cir.1994)).

Evidence is "new" if it was "not in existence or available to the claimant at the time of the administrative proceeding." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) (citing *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990)). Evidence is "material" if there is "a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Id*. (citing *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988)). However, "It is well established that a Sentence Six remand is not appropriate to consider evidence that a claimant's condition worsened after the administrative hearing." *Walton v. Astrue*, 773 F. Supp.2d 742, 753 (N.D. Ohio Jan. 18, 2011) (citing *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 685 (6th

Cir. 1992)). "Good cause" is a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ. *Id*. (citing *Willis v. Sec'y of Health & Human Servs.*, 727 F.2d 551, 554 (1984)).

Trotter does not show that the evidence submitted after the ALJ's decision is material. She identifies her Craniofacial Clinic Team Evaluation at Rainbow Babies & Children's Hospital dated June 24, 2015, as new and material evidence. Doc. 14, p. 6. She contends that, at that evaluation, she reported frequent locking of her right jaw and pain and that her right BAHA was not working and she felt that she could not hear as well without it. *Id*. She was also found to have skin overgrowth on the right abutment site. *Id*. First, although Trotter reported that her right BAHA was not working, it was because the battery was corroded. Tr. 7. The evaluator cleaned it and restored it to working condition; it was thereafter deemed to "sound[] excellent." Tr. 7. Next, Trotter's subjective complaint at the evaluation that she could not hear as well as she used to was a complaint she testified to at the hearing, i.e., it was cumulative. Tr. 82. So was her complaint regarding her jaw locking. Tr. 86. And there was substantial evidence in the record showing that she had been unable to use her right BAHA due to skin growth at the abutment site. *See* Tr. 113 (disability hearing officer's report dated May 15, 2015, detailing Trotter's problems with skin growth at the abutment site); Tr. 278 (Dr. Arnold's letter stating that Trotter was not able to wear her right hearing aid because of skin growth at the abutment site); Tr. 560 (Report from Audiologist Dr. Schulman stating that Trotter was not wearing her right BAHA but was still able to hear well with the left BAHA only); Tr. 83 (Trotter testimony explaining that she has not worn her right BAHA for seven years). This evidence, therefore, is cumulative; it cannot be said that there is a reasonable probability that the ALJ would have reached a different conclusion if presented with this evidence. *See Foster*, 279 F.3d at 357.

The other item Trotter identifies as new and material evidence is a treatment note from surgery performed by Dr. Arnold on January 8, 2016, to drain an abscess that had developed at Trotter's left BAHA site and to revise the hypertrophic scarring at the right BAHA site. Tr. 11. She also had her right abutment replaced. Tr. 12. But evidence of hypertrophic scarring was in the record (Tr. 278) and Dr. Arnold predicted that skin overgrowth on the right BAHA site was likely to be an ongoing problem (Tr. 577), which the ALJ noted (Tr. 67). Again, it cannot be said that this evidence would have changed the ALJ's conclusion because it is cumulative of other evidence in the record, a sentiment shared by Trotter. *See* Doc. 14, p. 7 (asserting that the new evidence "confirms" Trotter's consistently reported symptoms in the record regarding her "hearing difficulties").

Trotter alleges that this evidence shows that she continued to struggle with difficulty hearing, but, as the record shows (and the ALJ noted), she had been repeatedly assessed at audiologic evaluations as having significant and satisfactory benefit from her BAHA implants (Tr. 65, 575) even when she wore only one (Tr. 560, 562). And she lives alone, attends college full time, and obtains good grades, i.e., her difficulty hearing does not prevent her from achieving these significant milestones. Tr. 68.

Finally, Trotter asserts that "remand is proper for the consultation of a medical expert." Doc. 14, p. 7. She submits that the additional medical evidence which she claims is new and material:

> could have caused the ALJ to change the state agency physician's finding that the impairment is not equivalent in severity to any impairment in the Listing of Impairments. This is particularly true given that the ALJ acknowledges Plaintiff was granted disability benefits as a child based on equivalency to listing 102.08(A). The ALJ's decision is void of any real discussion about equivalency to this listing or others which further warrants remand.

Doc. 14, p. 9.

This argument is without merit. First, as discussed above, Trotter's additional evidence is not material and she therefore is not entitled to a Sentence Six remand. Next, although Trotter refers to Listing 102.08(A), this listing is only for children. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, Part B1, Listings 102.10, 102.11.[2] Upon reaching age 18, Trotter was no longer eligible to be found disabled under this listing, *see id.*, a fact that the ALJ acknowledged (Tr. 62). Finally, contrary to Trotter's assertion, the ALJ discussed other listings in his decision, Tr. 62 (considering Listings 2.09, 2.11, 12.04 and 12.08), and Trotter does not identify a listed impairment that she claims to meet or equal. Thus, to the extent it could be said that Trotter is arguing that the ALJ erred when he considered whether she met or equaled a listing at Step Three (a generous reading of Trotter's brief), such an argument fails. *See Foster*, 279 F.3d at 355-356 ("A claimant must demonstrate that her impairment satisfies the diagnostic description for the listed impairment in order to be found disabled"); Soc. Sec. Ruling 96-6P, at *3 (the ALJ is responsible for deciding the ultimate legal question whether a listing is met or equaled and he is not required to obtain an additional medical expert opinion on the issue of equivalency unless he decides that doing so would be reasonable).

---

[2] Listing 102.08, hearing impairments, has since been renamed hearing loss treated with/without cochlear implantation and re-designated 102.10 and 102.11. *See Bush v. Colvin*, 2014 WL 1023376, at *2, n. 2 (D.Md. March 14, 2014).

15

## VII. Conclusion and Recommendation

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

Dated: April 25, 2017

Kathleen B. Burke
United States Magistrate Judge

## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986)